SHAHNAAZ A.R. KHAN f/k/a SHAHNAAZ
A. AZEEM,

              Plaintiff,

              v.

ONEWEST BANK, F.S.B., and OCWEN
LOAN SERVICING, LLC,

              Defendants.

No. 16 CV 8074

Judge Manish S. Shah

## MEMORANDUM OPINION AND ORDER

Shahnaaz Azeem sues OneWest Bank, F.S.B., and Ocwen Loan Servicing, LLC, for breach of contract and statutory violations arising out of her mortgage loan modification.[1] Defendants move to dismiss for failure to state a claim and for failure to join Azeem's ex-husband as an indispensable party. For the following reasons, defendants' motion to dismiss is denied.

## I. Background

In 2006, plaintiff Shahnaaz Azeem executed a mortgage loan with Guaranty Bank to purchase a family home. [1] ¶ 9.[2] (Azeem's husband, Ahmed Azeem, co-signed the mortgage, but they divorced in April 2016. [21-1]; [32-1]. Ahmed is not a party to this suit.) Two years later, a foreclosure complaint was filed in state court.

---

[1] Since the events in question, Ms. Azeem and OneWest Bank have changed names (to Khan and CIT Bank, N.A., respectively). *See* [21] at 1; [32] at n.1. For clarity, the opinion refers to Azeem and OneWest Bank.

[2] Bracketed numbers are entries on the district court docket.

At some point afterwards, the loan was transferred to OneWest Bank, F.S.B., who was substituted into the foreclosure proceedings. [1] ¶¶ 10–11. Ocwen Loan Servicing, LLC, later became the loan servicer. [1] ¶ 12. The foreclosure case was still pending on March 18, 2015, when Azeem received a proposed loan modification agreement from Ocwen for modified monthly payments of $2,453.89 for principal, interest, and escrow. [1] ¶¶ 13, 15–16. The cover letter to the loan modification agreement stated that Azeem had two weeks to either confirm her intent to accept the offer or submit her first monthly payment, and that if she did so, Ocwen would "suspend the next legal action in the foreclosure proceedings." [1-1] at 2. The loan modification agreement listed several preconditions to the modification of Azeem's loan documents:

1. Preconditions to Modification. I understand and agree that:

A. TIME IS OF THE ESSENCE under this Agreement:

B. The Loan Documents shall not be modified unless and until (i) I successfully complete the Trial Period (as defined below), (ii) the title insurance company insuring the lien of the Mortgage assures Servicer (or otherwise confirms to its satisfaction) that the Mortgage, as modified by this Agreement, continues to enjoy lien priority for the full amount of the Note and (iii) I receive from the Servicer a copy of this Agreement signed by the Servicer.

C. In order for the terms of this Agreement to become effective, I promise to make an initial payment of $2,453.89 on or before 4/1/2015 and one (1) Trial Payment of principal and interest in the amount of $2,453.89 to Servicer on or before 5/1/2015 ("Trial Period").

D. If I successfully complete the Trial Period, the "Loan Documents" will be modified pursuant to the terms of this Agreement. However, I acknowledge and agree that if I fail to send any payment on or before the respective due date, the

> Servicer's modification offer will be null and void and this
> Agreement will not become effective, and I further understand
> and acknowledge that the Servicer may commence or resume
> foreclosure or other activities related to the delinquency of my
> Loan under its original terms. [. . .]

[1-1] at 6, ¶ 1. The agreement further stated that if these preconditions were met,
then the loan documents would be automatically modified:

> 2. The Modification. If all preconditions to the modification set forth in
> Section 1 of this Agreement have been met, then the Loan Documents
> shall automatically become modified on 6/1/2015 (the "Modification
> Effective Date"). I understand that if I have failed to make any
> payments as a precondition to this modification, this modification will
> not take effect and this Agreement will not be effective. If this
> Agreement becomes effective, the Loan Documents will be modified to
> include the following new terms. . .

[1-1] at 6–7.

Upon receiving the letter, Azeem called Ocwen to give notice of her intent to
accept the loan modification, and, by March 30, 2015, she signed and returned the
loan modification documents. [1] ¶¶ 14, 19. She made an initial trial payment of
$2,453.89 on March 31, 2015, and another on May 1, 2015. [1] ¶¶ 20–21. She also
set up an automatic withdrawal from her bank account, and over the next three
months, Ocwen deducted monthly payments for June, July, and August 2015. [1]
¶¶ 23–24. In August 2015, through her online account, Azeem received notices from
Ocwen confirming the permanent loan modification. [1] ¶ 25. But when Ocwen did
not withdraw her payment for September 2015, Azeem called to clarify. An Ocwen
representative instructed her to send the payment by mail, so Azeem sent it by
cashier's check through certified mail. [1] ¶¶ 26–28.

A few weeks later, Ocwen rejected and returned Azeem's September payment. When she called to clarify, the representative advised her to again send her September and October payments by mail. [1] ¶¶ 29–30. Azeem mailed the checks, but the next day, she learned through her online account that Ocwen claimed that she owed monthly payments of $4,502.96 and was in substantial default. [1] ¶¶ 31–32. The foreclosure action proceeded, and on October 15, 2015, Ocwen scheduled a judicial sale of the property. [1] ¶¶ 33–34. Ocwen also assessed Azeem default-related fees for property inspections and for the judicial sale. [1] ¶¶ 40–42. Azeem hired attorneys for the foreclosure action, who moved to enforce the loan modification and stay the judicial sale. [1] ¶ 35. Ocwen signed the loan modification on November 5, 2015, and the foreclosure case was dismissed a few days later. [1] ¶¶ 36–37.

A few months later, in February 2016, Ocwen sent Azeem an escrow statement asserting that Azeem owed an escrow shortage of $8,317.18, which would be collected over 60 months—increasing Azeem's monthly payments to $2,703.40. [1] ¶¶ 43–46. Azeem paid the increased amount. [1] ¶ 47. Shortly thereafter, Azeem sent Ocwen a Notice of Error and Request for Information to dispute the default-related fees imposed after June 2015, to dispute the escrow shortage, and to request certain documents related to the fees and her account history. [1] ¶¶ 48–49. Ocwen received Azeem's letter on March 10, 2016, and responded on March 30, 2016. [1] ¶¶ 48, 50.

In August 2016, Azeem sued OneWest Bank and Ocwen, alleging that they breached the loan modification agreement by charging her default-fees and pursuing foreclosure, that they violated the Fair Debt Collection Practices Act, 15 U.S.C. §§ 1692e, 1692f (FDCPA), and the Illinois Consumer Fraud Act, 810 ILCS 505/1 *et seq.* (ICFA), by using deceptive and unfair means to collect a debt, and that Ocwen's response to her request for information violated Real Estate Settlement Procedures Act, 12 U.S.C. § 2605 (RESPA). Defendants move to dismiss all claims for failure to state a claim and for failure to join Azeem's ex-husband as an indispensable party.

## II.    Legal Standards

To survive a motion to dismiss for failure state a claim under Federal Rule of Civil Procedure 12(b)(6), a complaint must contain factual allegations that plausibly suggest a right to relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 677–78 (2009). In ruling on a motion to dismiss under 12(b)(6), a court must construe all factual allegations as true and draw all reasonable inferences in the plaintiffs' favor, but the court need not accept legal conclusions or conclusory allegations. *Id*. at 680–82. Claims sounding in fraud are subject to the heightened pleading standard set forth in Federal Rule of Civil Procedure 9(b), which requires a plaintiff to describe the "who, what, when, where, and how of the fraud." *Cincinnati Life Ins. Co. v. Beyrer*, 722 F.3d 939, 948 (7th Cir. 2013).

When resolving a Rule 12(b)(6) motion, a court may only consider allegations in the complaint, documents attached to the complaint, and documents that are both referred to in the complaint and central to its claims. *Levenstein v. Salafsky*,

164 F.3d 345, 347 (7th Cir. 1998). However, when resolving a motion to dismiss for failure to join a necessary and indispensable party under Rule 12(b)(7), the court may look outside the pleadings, although the allegations of the complaint are accepted as true. *Davis Cos. v. Emerald Casino, Inc.*, 268 F.3d 477, 479 n.2, 480 n.4 (7th Cir. 2001). Azeem has attached multiple documents to her complaint, including the loan modification agreement [1-1], the escrow shortage letter [1-2], her letter to Ocwen [1-3], and Ocwen's response, [1-4]. These exhibits are considered in resolving the motions to dismiss. Defendants included with their reply brief a copy of Azeem's May 2015 online account notice. [35-1]. This document is not referred to in Azeem's complaint, central to her claims, or relevant to the Rule 12(b)(7) motion, and therefore it is not considered.[3] The parties also included other exhibits with their briefs that are considered in resolving the Rule 12(b)(7) issue: Azeem's mortgage [21-1], Azeem's divorce judgment [32-1], and a quitclaim deed from Azeem's ex-husband to Azeem [32-2].

## III. Analysis

### A. Rule 12(b)(7)

Rule 19 was designed to "permit joinder of all materially interested parties to a single lawsuit so as to protect interested parties and avoid waste of judicial resources." *Askew v. Sheriff of Cook Cty., Ill.*, 568 F.3d 632, 634 (7th Cir. 2009).

---

[3] Defendants argue that Azeem's August 2015 online notices, which *are* referred to in the complaint, are not available and that this May 2015 example shows that Ocwen's online notices do not give sufficient detail to support Azeem's allegations. This is a motion to dismiss, not a summary judgment motion, and the May 2015 notice is not considered. Moreover, it does not contradict the allegations in Azeem's complaint, which must be taken as true in resolving a motion to dismiss.

Defendants argue that Azeem's action must be dismissed under Rule 12(b)(7) for failing to join a party because her ex-husband, Ahmed Azeem, is co-signer on both the mortgage and the loan modification agreement and therefore an indispensable party to this action. Azeem responds that joinder is not feasible because her ex-husband now lives in Pakistan and that he is not an indispensable party because his absence does not prevent the court from determining defendants' liability to Azeem.

In resolving a motion brought under Rule 12(b)(7), a court must first identify if any parties are "required" by Rule 19(a). *Askew*, 568 F.3d at 635. The parties argue whether labeling Ahmed as a co-obligor or co-obligee on the mortgage and the loan modification merits finding that he is a required party, but at the end of the day, all of their cited cases rest on the analysis set forth Rule 19(a)(1), specifically whether the person's absence would prevent complete relief among existing parties, would impair that person's ability to protect their interest in the action, or would leave an existing party subject to multiple or inconsistent obligations.

Azeem argues that her ex-husband is not a required party because he had no personal liability on the mortgage since his debt was discharged in bankruptcy in December 2014 and since he quit-claimed his interest in the property to her in July 2015. But his title to the property is not at issue, and he signed the loan modification agreement in March 2015, after his bankruptcy but before the April 2016 divorce. The divorce judgment does specify that Azeem would hold Ahmed harmless for breach of the loan modification agreement and that, upon modification,

she would have 180 days to refinance or otherwise cause Ahmed's name to be removed from the loan. [32-1] at 5. While this provision indicates that the divorce may have been intended to leave Azeem with the sole interest in the house and mortgage, it does not address her ex-husband's interest in loan modification matters that occurred after the bankruptcy but before their divorce. In these circumstances, while his absence would not prevent Azeem from obtaining relief, it would impair his own ability to protect any interest he has against defendants for their alleged actions—for example, if he contributed to the modified monthly payments or attorney fees to prevent foreclosure. His absence could also expose defendants to multiple and possibly inconsistent obligations arising from those interests. Ahmed Azeem is, therefore, a required party for Azeem's claims—except for her RESPA claim, which is based on a letter sent in Azeem's name only. Azeem represents that her ex-husband is no longer in the country, so joinder is not feasible.

If a required party cannot be joined, "dismissal is not automatic." *Askew*, 568 F.3d at 635. Under Rule 19(b), "the court must determine whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed," considering factors including prejudice to the person or existing parties from a judgment rendered in the party's absence, the extent to which any prejudice could be lessened by tailoring the relief, whether a judgment rendered in the person's absence would be adequate, and whether the plaintiff would have an adequate remedy if the action were dismissed for nonjoinder. If this action was dismissed for nonjoinder, Azeem would be left without a remedy, a factor that

weighs heavily in favor of proceeding without her ex-husband. Moreover, while he may have an interest to assert against defendants, it seems highly unlikely that he would do so. Not only has he left the country, but the structure of the parties' divorce judgment strongly suggests that they intended to divest Ahmed Azeem from any interest in and obligations for the house and mortgage. When weighed against the prejudice to Azeem from being left without an adequate remedy, dismissal for failure to join a party is not warranted in these circumstances.

**B.      Rule 12(b)(6)**

1.   *Breach of Contract*

The elements of a claim for breach of contract are (1) the existence of an enforceable contract, (2) plaintiff's performance, (3) defendant's breach, and (4) damages. *Avila v. CitiMortgage, Inc.*, 801 F.3d 777, 786 (7th Cir. 2015).[4] Azeem claims that defendants breached the loan modification agreement by rejecting her payments, scheduling the property for foreclosure, charging default-related fees, and overcharging her for escrow payments. Defendants argue that the Azeem failed to state a claim for breach of contract for two reasons. First, defendants argue that Ocwen's alleged actions from June through November 2015 did not breach the loan modification agreement because a contract had not been formed until the agreement was executed by Ocwen on November 5, 2015. Azeem responds that the loan modification became binding when she performed everything required of her and when Ocwen accepted additional monthly payments. She argues that the

---

[4] Neither party addresses choice of law. The loan modification agreement lacks a choice of law provision, but the mortgage states that it is governed by Illinois law. [21-1] at 12–13.

contract is illusory under Ocwen's reading because Ocwen could arbitrarily withhold its signature, thereby preventing a binding contract, even if she performed all the conditions.

Viewing all inferences in Azeem's favor, she has sufficiently alleged the existence of an enforceable contract. Reading the loan modification agreement so as to give effect to all of its provisions, Ocwen's signature on the loan modification agreement was required before the loan documents would be modified, but it was not a condition precedent to contract formation. The signature requirement is found in the section "Preconditions to Modification" and provided that "[t]he Loan Documents shall not be modified unless and until . . . (iii) I receive from the Servicer a copy of this Agreement signed by the Servicer." [1-1] at 6, ¶ 1.B. Under the terms of the agreement, then, the loan modifications were unmodified and in force until this and the other preconditions were met (i.e., continued lien priority and trial period payments).

But while Ocwen's signature may have been required before the loan documents would be modified, it was not required to make the *loan modification agreement* itself a binding contract. A contract is formed through offer, acceptance, and consideration. *See Zemke v. City of Chicago*, 100 F.3d 511, 513 (7th Cir. 1996). In Illinois, the "test for an offer is whether it induces a reasonable belief in the recipient that he can, by accepting, bind the sender." *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 561 (7th Cir. 2012). "[W]hen the promisor conditions a promise on *his own* future action or approval, there is no binding offer. But when the

promise is conditioned on the performance of some act by *the promisee* or a third party, there can be a valid offer." *Id*. Defendants provided Azeem with an offer by sending her the loan modification agreement, which promised to modify her loan and hold off foreclosure proceedings if she successfully completed the trial period payments (and if the other preconditions were met):

> D. If I successfully complete the Trial Period, the "Loan Documents" will be modified pursuant to the terms of this Agreement. However, I acknowledge and agree that if I fail to send any payment on or before the respective due date, *the Servicer's modification offer* will be null and void and this Agreement will not become effective, and I further understand and acknowledge that the Servicer may commence or resume foreclosure or other activities related to the delinquency of my Loan under its original terms. [. . .]

[1-1] at 6, ¶ 1.D (emphasis added). Azeem accepted the offer when she returned the signed agreement and promised to be bound by its terms. The statements about the agreement becoming "effective" pertain to the actual modification of the loan documents (set for June 1, 2015):

> 2. The Modification. If all preconditions to the modification set forth in Section 1 of this Agreement have been met, then the Loan Documents shall automatically become modified on 6/1/2015 (the "Modification *Effective* Date"). I understand that if I have failed to make any payments as a precondition to this modification, this *modification will not take effect* and this Agreement will not be *effective. If this Agreement becomes effective, the Loan Documents will be modified* to include the following new terms. . .

[1-1] at 6–7 (emphasis added). The loan modification agreement also included cognizable legal detriments sufficient for consideration. *See Wigod*, 673 F.3d at 564. Therefore, Azeem has alleged the existence of an enforceable agreement, which is not contradicted by the exhibits to her complaint.

Azeem has sufficiently alleged a claim for breach of the loan modification agreement. The elements of a claim for breach of contract are (1) the existence of an enforceable contract, (2) plaintiff's performance, (3) defendant's breach, and (4) damages. *Avila*, 801 F.3d at 786. The loan modification agreement entered into by the parties was an enforceable contract. Azeem alleges that she performed under the loan modification agreement but that Ocwen pursued foreclosure and default-related fees in breach of the agreement, requiring her to hire attorneys to forestall the judicial sale of her home and charging her for default-related fees. Ocwen signed the agreement in November 2015, satisfying all conditions precedent and making the loan modification retroactively effective as of June 2015, and Azeem plausibly alleges conduct amounting to a breach after June 2015. She has alleged a prima facie claim for breach of contract.[5]

Defendants also argue that Azeem's breach of contract claim fails because the documents attached to the complaint show that Azeem was not overcharged for

---

[5] Even if Ocwen's signature had been a condition precedent to the enforceability of the loan modification agreement, Azeem alleged facts which allow a plausible inference that Ocwen may have waived (or may be estopped from asserting) it as a condition precedent. *See* 13 Williston on Contracts § 39:17 (4th ed.) ("[A] condition which has been inserted for the benefit of one party may be voluntarily waived by that party if it wishes to proceed despite the failure of the condition, and [t]he party who has waived the condition is deemed estopped from asserting nonperformance of the condition as a defense in an action."). According to Azeem's complaint, Azeem successfully completed the trial period before the "Modification Effective Date" of June 1, 2015, after which Ocwen continued to accept her monthly payments and later confirmed the permanent loan modification through her online account. Ocwen may have manifested its acceptance of the loan modification prior to signing it. Because her breach of contract claim survives regardless, I need not address at this time defendants' footnote argument that the offer to halt foreclosure proceedings if Azeem intended to sign the loan modification—an offer listed on the cover letter to the loan modification—was unenforceable because it did not comply with the statute of frauds.

escrow. The complaint alleges that defendants breached the loan modification agreement by charging Azeem's escrow account above the limits allowed by the mortgage contract or RESPA, and by imposing an escrow shortage when none existed. Defendants contend that the escrow statement that Azeem attached to the complaint show that the increased charges were meant to account for a future escrow shortage of $8,317.18, not past shortages. Azeem responds that she paid over $12,000 in escrow payments between April 2015 and February 2016, but that Ocwen only allocated around $6,000 to escrow.

Azeem does not state a claim for breach of the loan modification agreement based on the increased escrow payments. The loan modification agreement stated that her new estimated monthly escrow payment would be $1,090.22, which "adjusts annually after year 1" and which "may be adjusted periodically in accordance with applicable law." [1-1] at 7. The agreement further provided that, to the extent allowed under RESPA, Ocwen could collect and hold escrow funds for taxes, assessments, and insurance premiums. [1-1] at 9–10. Azeem was not locked into a $1,090.22 escrow payment, which would be adjusted to account for changes in taxes and insurance premiums.

Under RESPA, a servicer can charge monthly payments equal to one-twelfth of the estimated total escrow disbursements for the year, plus an amount to maintain a "cushion" of one-sixth of the estimated total escrow disbursements for the year (to cover unanticipated disbursements or disbursements made before the borrower's payments are available), plus additional amounts to make up for a

shortage. 12 C.F.R. § 1024.17(c)(1)(ii). Ocwen sent Azeem a letter in February 2016, announcing that her projected escrow disbursements for the year were a $6,415.18 tax payment in May 2016, a $6,415.18 tax payment in August 2016, and a $1,583.00 insurance payment in January 2017, for a total of $14,413.36. [1-2] at 3. (Azeem does not allege that these estimates were incorrect.) $14,413.36 divided by twelve amounts to a $1,201.11 monthly payment, already more than Azeem had been paying. [1-1] at 3. But RESPA also allowed Ocwen to collect a RESPA "cushion" of one-sixth the total escrow disbursements for 2016, amounting to $2,402.22. [1-1] at 4. Due to the timing of her tax payments, the escrow account needed to start April 2016 with $9,227.03 in order to have enough funds for a $2,402.22 cushion after her August 2016 tax payment. *See* [1-2] at 3. But Azeem's projected balance for April 2016 was a mere $909.85, which was $8,317.18 short. [1-2] at 3.

Perhaps misunderstanding Ocwen's escrow calculations, Azeem claims that Ocwen only credited her for $6,005.55 in past escrow payments when she had paid around $12,000 in escrow payments the previous year. But the $6,005.55 amount was clearly meant to account for the five *future* $1,201.11 payments remaining between Ocwen's letter and the August 2016 tax payment, by which time Azeem's escrow account needed to have disbursed $12,830.36 in taxes and be left with a $2,402.22 cushion. Viewed in this context, Ocwen's calculation of the $8,317.18 escrow shortage appears to be accurate. *See* [1-4] at 2–3.

OneWest Bank also argues for dismissal of the breach of contract claim against it, contending that it was merely Azeem's former loan servicer and was not

a party to the loan modification agreement. But the complaint alleges that Azeem's mortgage loan was transferred from Guaranty Bank to OneWest Bank and that Ocwen was acting as servicer for OneWest Bank. It is plausible to infer from the complaint that Ocwen was offering the loan modification agreement—which would permanently alter the terms of the mortgage loan owned by OneWest Bank—as OneWest Bank's agent. Whether this is found to be the case upon further factual development is another matter. Although Azeem cannot pursue a breach of contract claim based on escrow shortages, she has sufficiently pled a breach of contract claim on other grounds so that dismissal is not warranted.

### 2. *FDCPA Claim*

The FDCPA prohibits a debt collector from using "any false, deceptive, or misleading representation or means" and "unfair or unconscionable means" in connection with the collection of any debt. 15 U.S.C. §§ 1692e, 1692f. Azeem claims that defendants are "debt collectors" who employed deceptive and unfair means in attempting to collect on Azeem's mortgage, by threatening to sell her home at a judicial sale, by assessing wrongful default-related fees after the loan modification, and by refusing to accurately communicate with Azeem. Defendants argue that Azeem's FDCPA claim fails because it is premised upon the same conduct as Azeem's (supposedly failed) breach of contract claim and because foreclosure-related activities are not collection of a "debt" under the FDCPA.

None of these arguments merit dismissal of Azeem's FDCPA claim. Azeem's breach of contract claim has not failed at this stage, and she alleges more than just foreclosure-related activities—she also alleges misrepresentations about the status

of her mortgage. She may also proceed on her theory that defendants' foreclosure-related activities fell under the FDCPA. The Seventh Circuit has not yet directly addressed whether foreclosure-related activities are debt collection under the FDCPA, but a majority of federal appellate courts have found that it is. *Glazer v. Chase Home Finance LLC*, 704 F.3d 453 (6th Cir. 2013), explains that if the purpose of an activity taken in relation to a debt is to obtain payment on it, then that activity "is properly considered debt collection." *Id*. at 461. The Seventh Circuit has similarly held that while there is no bright-line rule for determining whether a communication from a debt collector was made in connection with the collection of any debt, "a communication made specifically to induce the debtor to settle her debt will be sufficient to trigger the protections of the FDCPA." *Gburek v. Litton Loan Servicing LP*, 614 F.3d 380, 385 (7th Cir. 2010).

Viewed in this framework, as *Glazer* explains, mortgage foreclosure can be debt collection because "*every* mortgage foreclosure, judicial or otherwise, is undertaken for the very purpose of obtaining payment on the underlying debt, either by persuasion (*i.e.*, forcing a settlement) or compulsion (*i.e.*, obtaining a judgment of foreclosure, selling the home at auction, and applying the proceeds from the sale to pay down the outstanding debt)." 704 F.3d at 461. And no provisions in the FDCPA preclude it from reaching foreclosure or the enforcement of security interests generally. *Id*. at 461–62. Several other appellate courts agree. *See Kaymark v. Bank of Am., N.A.*, 783 F.3d 168, 179 (3d Cir. 2015) ("[F]oreclosure meets the broad definition of 'debt collection' under the FDCPA, and it is even

contemplated in various places in the statute.") (citations omitted); *Reese v. Ellis,*
*Painter, Ratterree & Adams, LLP,* 678 F.3d 1211, 1218 (11th Cir. 2012) ("A
communication related to debt collection does not become unrelated to debt
collection simply because it also relates to the enforcement of a [mortgage] security
interest."); *Kaltenbach v. Richards,* 464 F.3d 524, 529 (5th Cir. 2006) ("[A] party
who satisfies § 1692a(6)'s general definition of a 'debt collector' is a debt collector for
the purposes of the entire FDCPA even when enforcing security interests."); *Wilson
v. Draper & Goldberg, P.L.L.C.,* 443 F.3d 373, 376 (4th Cir. 2006) (initiation of
foreclosure proceedings was attempt to collect "debt" under FDCPA); *compare Ho v.
ReconTrust Co., NA,* 840 F.3d 618, 621 (9th Cir. 2016) (communications limited to
the foreclosure process "do not transform foreclosure into debt collection" under the
FDCPA).[6]

Here, Azeem alleges that defendants threatened to sell her home through a
judicial sale in an attempt to collect Azeem's defaulted home loan. This sufficiently
alleges that defendants acted in collecting on a debt under the FDCPA. *See, e.g.,
Gburek,* 614 F.3d at 386 (letter that was loan servicer's "opening communication in
an attempt to collect [plaintiff's] defaulted home loan—by settlement or otherwise"
qualified as a communication in connection with an attempt to collect a debt even

---

[6] Defendants are correct that Illinois courts have not yet addressed whether mortgage
foreclosure is debt collection under the FDCPA. *See Aurora Loan Servs. LLC v. Kmiecik,*
2013 IL App (1st) 121700, ¶ 36. *Kmiecik* does not reach the issue and it not authoritative
here.

though it did not explicitly ask for payment).[7] Dismissal of Azeem's FDCPA claim is not appropriate.

### 3. *ICFA Claim*

To state a claim under the ICFA, a plaintiff must allege: (1) a deceptive or unfair act or practice by the defendant; (2) the defendant's intent that the plaintiff rely on the deceptive or unfair practice; and (3) the unfair or deceptive practice occurred during a course of conduct involving trade or commerce. *Siegel v. Shell Oil Co.*, 612 F.3d 932, 934 (7th Cir. 2010). A plaintiff is entitled to recovery under the ICFA when there is unfair or deceptive conduct; a plaintiff may allege that conduct is unfair under the ICFA without alleging that the conduct is deceptive. *Id.* at 935. A statement is deceptive under the ICFA "if it creates a likelihood of deception or has the capacity to deceive." *Bober v. Glaxo Wellcome PLC*, 246 F.3d 934, 938 (7th Cir. 2001). To be unfair under the ICFA, a defendant's conduct must "(1) violate public policy; (2) be so oppressive that the consumer has little choice but to submit; and (3) cause consumers substantial injury." *Siegel*, 612 F.3d at 935. "A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three." *Robinson v. Toyota Motor Credit Corp.*, 201 Ill.2d 403, 418 (2002).

Azeem alleges that defendants violated the ICFA through unfair and deceptive acts, by ignoring her loan modification and her payments, giving her

---

[7] The FDCPA might not apply to defendants if, prior to Azeem's default, OneWest Bank was the creditor or Ocwen was already servicing Azeem's loan. *See Carter v. AMC, LLC*, 645 F.3d 840, 843–44 (7th Cir. 2011). But Azeem alleges that both defendants became involved after the foreclosure case was filed. [1] ¶¶ 11 n.2, 12.

contrary instructions, attempting the judicial sale, and sending false information about default-related fees. She alleges that defendants' actions were intended to trick her into making timely payments while continuing to act as if she had defaulted. Defendants maintain that Azeem's ICFA claim fails because it is derivative of her breach of contract claim, because she does not plead with the specificity required under Rule 9(b), and because the facts do not establish a deceptive act or defendants' intent.

A breach of contractual promise, without more, is not actionable under the ICFA—otherwise a consumer plaintiff could convert any breach of contract suit into a consumer fraud action. *Avery v. State Farm Mut. Auto. Ins. Co.*, 216 Ill.2d 100, 169 (2005). But Azeem's ICFA claim is not entirely derivative of her breach of contract claim, because she alleged deceptive conduct beyond breach of the loan modification agreement, including: deceptive statements confirming the loan modification when defendants intended to pursue foreclosure, and conflicting statements rejecting Azeem's payments online while advising her over the phone to send payments by mail, when the following day Ocwen informed her through her online account that she was in default.

These details also sufficiently provide the "who, what, when, where, and how" of the alleged deceptive practices in this case to satisfy Rule 9(b) pleading requirements. She details the dates of events and the methods of her communication with Ocwen, for example that: Ocwen continued to accept her modified monthly payments after June 1, 2015 (the purported effective date of the

loan modification); Ocwen sent notices confirming her loan modification through her online account on August 6 and August 29, 2015; an Ocwen representative advised her to make her payments by mail but the next day Ocwen claimed, through her online account, that it was no longer honoring the loan modification agreement and that she was in default. Azeem also sufficiently alleges unfair conduct because Ocwen's alleged acceptance and encouragement of Azeem's performance under the loan modification while simultaneously pursuing a judicial sale and default-related fees could be viewed as offending public policy, unethical, and causing injury to consumers. While defendants argue that the complaint does not allege that they intended to deceive Azeem, even innocent misrepresentations and honest mistakes are actionable under the ICFA. *See Miller v. William Chevrolet/GEO, Inc.*, 326 Ill.App.3d 642, 655 (1st Dist. 2001) ("Nor need the defendant have intended to deceive the plaintiff; innocent misrepresentations or material omissions intended to induce the plaintiff's reliance are actionable."). More to the point is that Azeem has pled facts plausibly inferring that Ocwen intended Azeem to rely on its representations, for example the instruction to send two monthly payments by cashier's check. Azeem has sufficiently pled an ICFA claim.

4. *RESPA Claim*

RESPA requires a loan servicer to promptly respond to a "qualified written request" from a borrower seeking information related to the servicing of her loan or alleging that her account is in error. 12 U.S.C. § 2605(e). If a loan servicer receives a valid qualified written request, RESPA requires it to take the following actions, but only if applicable: (A) make appropriate corrections in the account of the borrower;

(B) after investigating the account, provide the borrower with a written explanation or clarification explaining why the account is correct; or (C) provide the borrower with the information requested by the borrower or explain why it is unavailable. *Perron on behalf of Jackson v. J.P. Morgan Chase Bank, N.A.*, 845 F.3d 852, 857 (7th Cir. 2017) (citing 12 U.S.C. § 2605(e)(2)(A)–(C)). Ocwen contends that it did not violate RESPA because it responded to Azeem's letter in writing, its escrow calculations were correct, and the complaint fails to allege damages or how Ocwen's response is noncompliant with RESPA. Azeem's complaint, however, alleges that Ocwen's written response was insufficient because Ocwen did not make corrections to the account or conduct a reasonable investigation. She argues that the response letter did not sufficiently explain the escrow shortage or make corrections to escrow calculations, and that the letter showed Azeem being charged $967.50 in outstanding default-related fees, which should have been corrected.[8]

Ocwen's letter responds to the general subject matter raised by Azeem's request and the escrow shortage calculations appear to be accurate. But that leaves unresolved whether Ocwen was justified in charging Azeem default-related fees after the purported June 1, 2015 effective date of the loan modification, and whether Ocwen should have corrected those fees after a reasonable investigation. Ocwen also argues that Azeem failed to allege damages from Ocwen's alleged RESPA violation. Azeem, however, alleges that she has suffered emotional distress

---

[8] Azeem acknowledges that the letter included the contact information for an Ocwen representative who could provide her with assistance. [32] at 14.

as well as improper default-related charges and fees, *see* [1] ¶ 57, and these allegations are sufficient to allege damages. *See, e.g., Catalan v. GMAC Mortg. Corp.*, 629 F.3d 676, 696 (7th Cir. 2011) ("[E]motional distress damages are available as actual damages under RESPA, at least as a matter of law."). Further factual and legal development may show that Ocwen's response was sufficient under RESPA, but at this stage, dismissal of Azeem's RESPA claim is unwarranted.

## IV. Conclusion

Defendants' motion to dismiss, [20], is denied.

ENTER:

_____
Manish S. Shah
United States District Judge

Date: 4/12/2017