| | |
|---|---|
| SHAHNAAZ A.R. KHAN f/k/a SHAHNAAZ A. AZEEM, | |
| Plaintiff, | No. 16 CV 8074 |
| v. | Judge Manish S. Shah |
| ONEWEST BANK, F.S.B. and OCWEN LOAN SERVICING, LLC, | |
| Defendants. | |

**MEMORANDUM OPINION AND ORDER**

Ocwen Loan Servicing offered mortgagor Shahnaaz Azeem a loan modification. Azeem made the required payments, and when Ocwen later went forward with foreclosure anyway, brought this lawsuit alleging breach of contract and violations of the Illinois Consumer Fraud Act, the Fair Debt Collection Practices Act, and the Real Estate Settlement Procedures Act. Ocwen and OneWest Bank move for summary judgment. For the reasons discussed below, the motion is granted with respect to OneWest Bank and granted in part as to Ocwen.

## I. Legal Standards

Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and she is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking

summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

## II. Background

Shahnaaz Azeem, along with her then-husband and co-borrower Ahmed A. Azeem, executed a mortgage loan with Guaranty Bank on January 26, 2006. [75] ¶ 2.[1] Guaranty Bank later transferred the loan to OneWest Bank, FSB. *Id*.[2] In October 2008, OneWest Bank filed a foreclosure action against Azeem for payment default. *Id*. ¶ 3. OneWest Bank then assigned the mortgage to U.S. Bank National Association as trustee. *Id*. ¶ 4. A division of OneWest Bank continued to service the loan on behalf of the trustee until November 1, 2013, when Ocwen took over. *Id*. ¶ 5.

In early 2015, Azeem applied for a loan modification. *Id*. ¶ 6. On March 11, an Ocwen representative called and said her application had been approved for a shared appreciation mortgage loan modification. *Id*. ¶ 7. The modification included an interest rate reduction and a decrease in monthly principal and interest payments. *Id*. ¶ 8. Twice during the call, the representative told Azeem that she would owe a

---

[1] Bracketed numbers refer to entries on the district court docket. Referenced page numbers are taken from the CM/ECF header placed at the top of filings, except in the case of citations to depositions and phone-call transcripts, which use the transcript's original page number. The facts are largely taken from plaintiff's responses to defendants' Local Rule 56.1 statements, [75], and defendants' responses to plaintiff's Local Rule 56.1 statements, [79], where both the asserted fact and the opposing party's response are set forth in one document. Any arguments raised in the Local Rule 56.1 statements, additional facts included in responses or replies, and statements that are unsupported by admissible evidence (or where a party fails to follow Local Rule 56.1's direction to cite to supporting material in the record) will be disregarded. Only facts that are properly controverted will be considered disputed.

[2] The parties' names have changed over time. OneWest Bank was previously known as IndyMac Bank and Shanaaz Azeem now goes by Shanaaz Khan. To maintain clarity and consistency with the previous filings, I refer to them as OneWest Bank and Azeem.

significant balloon payment at the end of her mortgage, estimated to be $261,272.61.

*Id*. ¶ 9. The representative told Azeem, "with this modification, if you are interested

in it, we need your first trial payment and the second one. After the second trial

payment is when you receive the final modification." [79] ¶ 7; [65-5] at 14.[3] She also

asked Azeem if she would like to verbally accept the modification, and Azeem

declined. [79] ¶ 8; [65-5] at 14. Ocwen mailed the modification-related documents to

Azeem the same day. [75] ¶ 11.

One cover letter dated March 11, 2015, said at the top, "Loan Modification

Available to You – We Can Lower Your Payment Please Read Carefully." [1-1] at 2.

The letter went on to say,

> TIME IS OF THE ESSENCE. You must contact us . . . [by phone] or in writing . . . to confirm your intent to accept this offer <u>within 14 days of this notice,</u> or alternatively, submit your first Total Monthly Payment as defined in the enclosed offer <u>within 14 days of this notice.</u> . . . If you contact us or make the payment within 14 days of this notice, we will not refer your loan to foreclosure, or if your loan has been referred to foreclosure, we will suspend the next legal action in the foreclosure proceedings. Please note, even if you notify us of your intent to accept the offer within 14 days of this notice, you must remit your Total Monthly Payment on or before the first payment date defined in the enclosed offer.

*Id*. A second letter with the same date, titled "Shared Appreciation Modification

Offer," included steps to take advantage of the offer. *Id*. at 4. Specifically, it read,

> STEP 1 **COMPLETE AND RETURN THE ENCOLSED AGREEMENT BY THE DUE DATE.** To accept this offer, you must <u>sign</u> and return both copies of the Shared Appreciation Modification Agreement and all Disclosures . . . in the enclosed, pre-paid envelope to Ocwen . . . by 4/1/2015. . . . If you do not send both copies of the <u>signed</u> Agreement and Disclosures by the above date, you

---

[3] Ocwen attempts to dispute this assertion by arguing that this conversation did not limit the terms of the modification agreement. But that does not change the substance of the conversation and so does not refute Azeem's statement of fact.

must contact us if you still wish to be considered for this program and have your loan modified. STEP 2. **MAKE YOUR INITIAL PAYMENT AND TRIAL PERIOD PAYMENT ON TIME.** To take advantage of this great offer, you must make an initial payment in place of your normal monthly payment.

*Id*. The letter listed the initial payment amount as $2,453.89, due April 1, 2015. *Id*. The modification agreement (a separate document) provided that the loan would not be modified unless and until: (i) the borrowers successfully completed the initial trial payments, (ii) the title insurance company assured the servicer that the mortgage, as modified, would continue to enjoy lien priority, and (iii) the borrowers received from the servicer a copy of the agreement with the servicer's signature. [75] ¶ 13; [1-1] at 6. If all those preconditions were met, the agreement stated, "then the Loan Documents [would] automatically become modified on 6/1/2015." [1-1] at 6. The agreement ended with two signature lines. [75] ¶ 13; [1-1] at 13.

On March 15, 2015, Azeem faxed Ocwen a list of questions about the modification and asked for a nineteen-day extension of the deadline to review, sign, and return the documents, in part because her husband was out of town. [75] ¶ 14; [65-5] at 19. Two days later, Azeem called Ocwen to ask about the modification offer and reiterate her request for an extension. [75] ¶ 15.[4] The Ocwen representative confirmed that both Azeem and her husband had to sign the agreement. *Id*. ¶ 17.[5] On

---

[4] In her response, Azeem improperly asserts additional details about the call, which I disregard. She does not refute Ocwen's assertion that she called to request an extension.

[5] Ocwen's assertion that on or around March 25, Ocwen told Azeem that the terms of the agreement were nonnegotiable, *see* [75] ¶ 18, is unsupported by the record. Ocwen cites to Katherine Ortwerth's affidavit, but Ortwerth does not claim to have personal knowledge of that phone call and she does not cite to anything in the record as support for her claim.

March 30, Azeem emailed Ocwen requesting an extension to submit the paperwork. *Id.* ¶ 19.[6] She also spoke with an Ocwen representative who advised her that she could send the paperwork a little later. *Id.* ¶ 20. On March 31—the day before Azeem's first payment and the signed agreement were due—Azeem spoke with yet another Ocwen representative. She said, "I'm a little bit curious, oh, you didn't send the agreement back on the 1st of April 2015, your modification is gone. I don't want that to happen." [77-6] at 16:18–22. The representative assured Azeem, "No, ma'am, that will not happen." *Id.* at 16:23–24. Azeem made her initial payment on time, but Ocwen did not receive the signed agreement by the April 1 deadline. [75] ¶¶ 21–22.

On April 27, 2015, Ocwen sent Azeem a letter advising her that it received her request for an extension, but that the terms of the modification agreement could not be adjusted. *Id.* ¶ 23. In a letter dated the same day, the Office of the Consumer Ombudsman for Ocwen informed Azeem, "If you wish to accept the approved Shared Appreciation Modification (SAM), you must return the agreement within the timeframe provided on the offer." [77-3] at 3. Azeem made her second trial plan payment on May 1, 2015. [75] ¶ 24. As of that date, Ocwen still had not received the signed agreement. *Id.* ¶ 25.[7] On May 4, an Ocwen representative entered onto its

---

[6] Consistent with LR 56.1, I disregard Azeem's additional information, that the reason she requested an extension was because she was waiting for HAMP modification approval.

[7] Azeem points out that the supportive testimony pertained to dates in July and August. But if Ocwen had not received the signed agreement by August 2015, then it also had not received it by May 2015. Further, Azeem's additional information—that on May 4, Ocwen noted "final trial plan pmt has been received. Trial plan is now Complete. See most recent trial plan approval code for plan type"—does not refute Ocwen's assertion that it had not received the agreement.

system, "Final Trial Plan Pmt has been received. Trial Plan is now Complete." [77-7] at 4. The next day, Azeem spoke with another Ocwen representative. [75] ¶ 26.[8] Two days after that, Ocwen called Azeem and advised her it had not received the agreement and that it was important that she send it immediately. *Id.* ¶ 28. Azeem explained she had not sent it because she was also pursuing a different modification under the Home Affordable Modification Program and said she would review the agreement with her attorney the next day. *Id.* ¶¶ 29–30. Ocwen responded that Azeem should not delay submitting the signed agreement because even though it had received her trial payments, Ocwen would not be able to complete the modification until it received a signed copy. *Id.* ¶ 31. Ocwen further advised that there was a limited period during which it could modify the loan after the deadline and reiterated that both Azeem and her husband needed to sign the agreement. *Id.* ¶¶ 32–33.

In mid-May, Ocwen received the agreement, dated March 21, 2015, but only Azeem had signed it. *Id.* ¶ 34.[9] On May 19, an Ocwen representative told Azeem it had received both trial period payments and the agreement and that it was waiting for updates from the underwriters to complete the modification. [79] ¶ 19. He also told Azeem, "you are not required to send anything else and the loan is pending to be

---

[8] The parties dispute what was said during this phone call. Ocwen asserts that Azeem told it she had not submitted the agreement because she needed to review it and that Ocwen advised her to return it as soon as possible. But for the same reasons discussed in note 5, its assertion is not properly supported.

[9] The parties dispute the exact day on which Ocwen received the agreement, but agree it was sometime in mid-May. Azeem also points to a phone call on May 19, during which an Ocwen representative told her Ocwen had received the agreement and was working on completing her loan modification, but this does not refute Ocwen's assertions that it included only her signature or that it was dated March 21. [75] ¶ 34.

completed, for the modification to be complete. You made your payments and returned the agreement and that is the only thing that you have to do." *Id.* ¶ 20; [77-8] at 8:3–8. Because it did not include Ahmed Azeem's signature, the agreement failed quality control on May 20. [75] ¶ 35. When Ocwen spoke with Ahmed on June 1, he acknowledged he had not signed the agreement. *Id.* ¶¶ 36–38.[10] In an undated fax to Ocwen, Azeem said that her husband was "not available [at] this time and when he is available to sign these . . . then I will fax." *Id.* ¶ 39; [65-5] at 43.

On June 11, a different representative told Azeem that Ocwen received the agreement and that it would expedite Azeem's file. [79] ¶ 22.[11] Four days later, Ocwen entered into its system, "Quality Check completed; No errors found." [77-7] at 6. On July 10, a representative told Azeem over the phone, "we did receive your agreement regarding the modification . . . So, the only thing that is pending to complete the process of the modification is the payment" for August. [77-10] at 3:11–24. In a computer entry from the same day Ocwen wrote, "we did receive her final MOD Agreement." [77-7] at 11. Another entry dated four days later included a comment that the agreement Azeem sent was not notarized—which Ocwen acknowledged was obviously incorrect, *see* [65-3] at 180:11–22—and suggested Azeem "forward [ ] a complete notarized modification agreement at the earliest, to review the loan further for modification and to avoid any denial." [77-11] at 2. On July 16, Ocwen denied the

---

[10] Though, as Azeem points out, on the same call Ahmed said, "I sign, my wife sign, whatever, who did not?" [75] ¶ 38; [65-5] at 38.

[11] Ocwen points out that it did not indicate that the agreement was fully executed or that it had passed quality control.

modification "because [Azeem] failed to return the corrected final modification agreement within the required time frame," and notified Azeem of its decision in a letter dated July 17. [79] ¶ 26.

On a call on August 5, when an Ocwen representative informed Azeem that her agreement failed to comply because she and her husband had not signed all the necessary pages, Azeem responded that she had previously sent the agreement, fully executed and signed by both of them in all necessary places. [79] ¶ 31; [77-14] at 3:11–5:14. That same day, Azeem faxed a copy, signed by both her and her husband and dated April 30, 2015. [75] ¶ 56. Azeem made timely monthly payments for June, July, and August, [79] ¶ 28, but Ocwen rejected and returned Azeem's September 2015 payment. *Id*. ¶ 39.[12] Azeem suffered anxiety and stress beginning when her house first went into foreclosure in 2008. [75] ¶ 80. She never sought medical treatment for her stress or anxiety. *Id*.

III.   **Analysis**

Azeem does not dispute that OneWest Bank is not liable, so summary judgment is appropriate on all claims against OneWest Bank. Ocwen moves for summary judgment on all counts, arguing that because no contract existed, its failure to comply with the modification agreement's terms was lawful.

---

[12] Ortwerth's testimony that "there was a time period where we weren't accepting payments" does not dispute the assertion that Azeem tendered payments in June, July, and August. *See* [65-3] at 16–19.

## A.     Breach of Contract

In Illinois,[13] the elements of a breach-of-contract claim are: "(1) offer and acceptance, (2) consideration, (3) definite and certain terms, (4) performance by the plaintiff of all required conditions, (5) breach, and (6) damages." *MC Baldwin Fin. Co. v. DiMaggio, Rosario & Veraja, LLC*, 364 Ill.App.3d 6, 14 (1st Dist. 2006). Azeem alleges that Ocwen breached the modification agreement when it pursued foreclosure—and charged her foreclosure-related fees—after the loan modification agreement became effective. Ocwen argues there was no valid contract, and therefore no breach, and that Azeem has failed to demonstrate damages with the requisite certainty.

### *1.     The Modification Agreement*

Ocwen first argues that the terms of its offer were clear—Azeem had to sign and return the agreement by April 1, 2015—and because Azeem did not return a fully executed agreement by that deadline, there was no contract and nothing to stop Ocwen from pursuing foreclosure. In response, Azeem argues that her failure to submit the agreement by April 1 is not dispositive because: (1) the agreement itself did not require her to sign and return it to become effective, or include a deadline to do so, (2) the two cover letters to the agreement gave conflicting terms of acceptance, (3) as evidenced by Azeem's phone conversations with its representatives, Ocwen intended to modify her loan despite her failure to return the signed agreement on

---

[13] The parties do not address choice of law but agree Illinois law governs. The loan modification agreement does not have choice-of-law provision, but the mortgage is governed by Illinois law. [21-1] at 12.

time, and (4) Ocwen eventually signed the agreement, making it retroactively effective to June 1.

Though the agreement itself does not specify permitted methods of acceptance—the letter titled "Shared Appreciation Modification Offer"—does. This letter, as demonstrated by its title, contains the terms of the offer: "To accept this offer, you must sign and return both copies of the Shared Appreciation Modification Agreement . . . by 4/1/2015." [1-1] at 4. The other cover letter, titled "Loan Modification Available to You – We Can Lower Your Payment Please Read Carefully," was not a conflicting offer. It notified Azeem that if she either informed Ocwen of her intent to accept the offer or made her payment within fourteen days, Ocwen would not refer her loan to foreclosure and would suspend any foreclosure proceedings already underway. Reading the two letters together, in addition to its main offer to modify Azeem's loan, Ocwen also offered to forgo or suspend foreclosure while it waited for Azeem to officially accept the modification. It did not say that informing Ocwen of intent to accept or sending payment would constitute acceptance of the modification offer, just that those actions would prevent immediate foreclosure, and so is not inconsistent with the offer letter.

But though Ocwen's initial loan-modification offer limited the method of acceptance, a reasonable juror could find that Ocwen later reiterated its offer without the same condition. On the same day Ocwen sent Azeem the written modification offer, an Ocwen representative asked Azeem over the phone if she would like to verbally accept the offer. Azeem declined to accept then, but this could be construed

as a new offer, modifying the permitted method of acceptance or at least as evidence that Ocwen was open to other methods of acceptance. After that day, Ocwen representatives continued to tell Azeem that she could return the signed agreement after the April 1 deadline. And though Ocwen consistently stressed the importance of returning the signed agreement as soon as possible, it also reassured Azeem it would not rescind the modification offer just because Azeem turned it in late.

Given Ocwen's reassurances, Azeem's failure to comply with the initial terms of acceptance does not preclude a reasonable juror from finding that at some point, Ocwen and Azeem came to a mutual understanding that Ocwen would modify her loan, creating a valid contract. Based on Azeem's version of the facts, one could conclude that Ocwen modified the terms of acceptance to allow her to accept in another manner—or at least at another time—and that Ocwen understood, at some point among the numerous calls and correspondences, that Azeem accepted its offer. That being the case, once the preconditions of modification were met—which Ocwen does not dispute occurred eventually—Azeem's loan was automatically modified as of June 1, 2015. In sum, Azeem did not comply with the terms of the original offer, but a jury could conclude the parties eventually agreed to modify the loan and that Ocwen's pursuit of foreclosure, and the fees that accompanied that pursuit, breached the agreement.

### 2. *Damages*

Azeem seeks emotional damages and attorneys' fees. She also seeks compensation for the default fees and escrow charges she asserts were wrongfully

assessed to her account and for the time she lost in disputing them. The party seeking damages bears the burden of proving those damages to a reasonable degree of certainty. *TAS Distrib. Co. v. Cummins Engine Co.*, 491 F.3d 625, 632 (7th Cir. 2007) (citing *In re Estate of Halas*, 209 Ill.App.3d 333, 349 (1st Dist. 1991)). "Damages are speculative only when uncertainty exists as to the fact of damages, rather than to the amount of damages." *Goran v. Glieberman*, 276 Ill.App.3d 590, 595 (1st Dist. 1995). When a party establishes that she is entitled to damages but fails to prove the amount to a reasonable degree of certainty, only nominal damages are recoverable at the discretion of the trial judge. *TAS Distrib.*, 491 F.3d at 632.

Azeem has not shown that the escrow shortage was miscalculated, s*ee Khan v. OneWest Bank, F.S.B.*, 2017 WL 1344535, 16 CV 8074, at \*6 (N.D. Ill. Apr. 12, 2017), and does not address Ocwen's point that the escrow calculation was correct, thereby forfeiting any argument to the contrary. *See Alioto v. Town of Lisbon*, 651 F.3d 715, 719 n. 1 (7th Cir. 2011). And some of the fees Azeem points to as wrongfully charged to her account accrued before Ocwen offered to modify her loan and were bundled into the new principal balance per the terms of the agreement. *See* [1-1] at 7. Azeem has not shown that Ocwen tried to double-collect those fees, and Ocwen's attempt to collect them per the terms of the agreement is not a damage caused by its alleged breach.

But there is at least a genuine dispute as to whether Azeem suffered other damages from Ocwen's breach. If a jury concludes that Ocwen and Azeem eventually agreed to modify Azeem's loan, and the loan was retroactively modified on June 1,

2015, a jury could also find that the foreclosure-related fees that accrued after June 1 were charged in violation of the agreement (or that Ocwen should have rescinded them once Azeem accepted Ocwen's offer).

A jury could also conclude that Ocwen's breach lead to emotional damages, lost time, and attorneys' fees. Ocwen argues that Azeem's conclusory allegations of damages are insufficient to generate a genuine dispute of material fact to prevent summary judgment on Azeem's breach of contract claim. In terms of emotional damages, Ocwen relies on the federal "strict standard for a finding of emotional damages 'because they are so easy to manufacture.'" *Sarver v. Experian Info. Sols.*, 390 F.3d 969, 971 (7th Cir. 2004) (quoting *Aiello v. Providian Fin. Corp.*, 239 F.3d 876, 880 (7th Cir. 2001)). But under Illinois law, which applies to Azeem's breach-of-contract claim, damages are speculative only when uncertainty exists as to the fact of damages. Based on Azeem's testimony that she paid her attorneys, lost time dealing with Ocwen (as evidenced by the numerous phone calls in the record), and experienced stress and anxiety, a reasonable jury could find that she was damaged in those ways and this is enough to withstand summary judgment on her breach-of-contract claim, even if her remedy is ultimately limited to nominal damages.[14]

---

[14] Ocwen does not address whether emotional damages are an appropriate remedy for Azeem's breach-of-contract claim. "[R]ecoverable damages are those which naturally result from the breach, or are the consequence of special or unusual circumstances which are in the reasonable contemplation of the parties when making the contract." *See Doe v. Roe*, 289 Ill.App. 3d 116, 130 (1st Dist. 1997). Recovery for emotional distress is excluded unless the contract or the breach was of a type that serious emotional disturbance was a particularly likely result. *Id*. (citing Restatement (Second) of Contracts § 353, at 149 (1981)).

**B.     Remaining Claims**

For each of Azeem's remaining claims, Ocwen relies largely on the same arguments it made with respect to Azeem's breach-of-contract claim: that because Azeem never accepted the agreement, Ocwen did not act unlawfully when it failed to comply with the terms of the agreement and that Azeem has not adequately demonstrated her damages.

*1.     ICFA*

As to Azeem's Illinois Consumer Fraud and Deceptive Practices Act claim, specifically, Ocwen also argues that no reasonable jury could conclude that it acted with the requisite intent. To prevail on a claim under ICFA, a plaintiff must demonstrate: "(1) a deceptive act or practice by the defendant, (2) the defendant's intent that the plaintiff rely on the deception, (3) the occurrence of the deception in the course of conduct involving trade or commerce, and (4) actual damage to the plaintiff (5) proximately caused by the deception." *Avery v. State Farm Mut. Auto. Ins. Co.*, 216 Ill.2d 100, 180 (2005). Even innocent misrepresentations and honest mistakes may be actionable under ICFA. *Miller v. William Chevrolet/GEO, Inc.*, 326 Ill.App.3d 642, 655 (1st Dist. 2001). Azeem needs to show only that Ocwen intended that she rely on its representations. *Id*. A breach of contract is not automatically actionable under ICFA, *see Avery*, 216 Ill.2d at 169, but a reasonable jury could conclude that Ocwen gave Azeem false information about the loan-modification process and that it intended for her to rely on its representations. Viewing the facts in the light most favorable to Azeem, Ocwen repeatedly told Azeem she did not need

to submit the agreement by the deadline and reassured her that everything was in order. It also accepted her payments, but then pursued foreclosure anyway. A reasonable jury could conclude that this was deceptive or unfair and (for the same reasons discussed above) that Azeem was damaged as a result.

### 2. FDCPA and RESPA

The Fair Debt Collection Practices Act forbids "any false, deceptive, or misleading representation or means in connection with the collection of any debt," including specifically, falsely representing "the character, amount, or legal status of any debt." 15 U.S.C. § 1692e. Ocwen exclusively argues that summary judgment is appropriate as to Azeem's FDCPA claim because Azeem never accepted the modification agreement and Ocwen never represented that it would implement the agreement without receiving the signed copy. Because there is a genuine dispute over whether the parties agreed to modify the loan, Ocwen has not shown that no reasonable jury could find for Azeem on her FDCPA claim.

The Real Estate Settlement Procedures Act requires loan servicers to respond to "qualified written requests" for information. 12 U.S.C. § 2605(e). Once a loan servicer receives a request, it must, if applicable: make appropriate corrections to the borrower's account; after investigating the account, provide a written explanation or clarification explaining why the account is correct; or provide the borrower with the information requested or explain why it was unavailable. *Perron on behalf of Jackson v. J.P. Morgan Chase Bank, N.A.*, 845 F.3d 852, 857 (7th Cir. 2017) (citing 12 U.S.C. § 2605(e)(2)(A)–(C)). Ocwen argues that Azeem's RESPA claim fails because the

escrow shortage was accurate, the default fees that accrued between June and November were proper, and Azeem has failed to show that she suffered specific damages. There was no error in the escrow calculation, so no reasonable factfinder could find for Azeem on that issue. But Azeem could prevail on her RESPA claim based on the default fees assessed to her account after June 1. Azeem asserts she sent a qualified written request, that Ocwen failed to correct its mistakes and remove the fees, and that she was damaged by having to pay those fees.

Ocwen also argues that because Azeem did not know whether its response to her qualified request was adequate, she did not suffer any emotional damages from any RESPA violation. Azeem does not refute this argument or dispute that she never knew whether Ocwen's letter was correct. In her testimony, Azeem indicated that the letter was stressful because it was difficult for her to meet her high monthly payment, but she did not mention any emotional suffering stemming from the letter itself. Absent evidence linking Azeem's emotional distress to the RESPA violation, Ocwen is entitled to summary judgment barring Azeem from recovering emotional damages on the RESPA count at trial.

I disagree with Ocwen that Azeem's assertions are so conclusory that no reasonable juror could award compensation based on her attorney's fees and loss of time. Ocwen relies on *Juno Online Servs. v. Juno Lighting, Inc.*, 979 F.Supp. 684 (N.D.Ill. 1997). There, the plaintiff simply alleged it was injured; it did not state what its injuries were. That is not the case here. Azeem asserts that she had to pay an attorney to file a lawsuit against Ocwen when it refused to honor the modification

agreement and that she lost time trying to communicate with Ocwen about her modification. The record contains phone transcripts and other correspondence that supports these assertions. Though Azeem has not provided specific calculations as to her damages, she has explained how she was injured and her assertions are not so conclusory that no reasonable factfinder could determine those injuries stemmed from Ocwen's actions.

## IV.  Conclusion

Defendants' motion for summary judgment, [63], is granted with respect to defendant OneWest Bank, and granted in part as to Ocwen. Azeem cannot recover emotional damages for her RESPA claim or damages based on the escrow calculation.

ENTER:

Manish S. Shah
United States District Judge

Date:  January 15, 2019